HERRICK & STEVENS and others, Appellees, v. SARGENT & LAHR and others, Appellants.

**Vendor and Vendee:** *Bona fide* PURCHASER: ABANDONMENT: ESTOPPEL.
1  The evidence in a contest over the title to a tract of land by contending purchasers is reviewed and held to sustain the theory that the first purchaser had abandoned his contract, either because he thought there was no profit in his contract, or because he believed he could procure an independent title at less cost, and that by his acts and representations he was estopped from asserting title as against the second purchaser.

**Public Lands:** LOCATION BY MILITARY WARRANT: TAXATION. The location of land under a military warrant segregates it from the public domain, and although the patent may be withheld pending an investigation of the rights of parties arising from conflicting claims thereto, the legal title so held by the government is in the nature of a trust, and the land is subject to taxation from the date of its location under the warrant and record of the entry.

**Same:** SALE FOR TAXES. Exemption from taxation under the federal statute of lands located by a military warrant is a personal privilege to the soldier himself, and does not obtain in favor of his assignee; so that lands located by the assignee of a warrant are taxable from the date of location, and a sale for taxes levied prior to issuance of patent will pass good title.

**Same:** SUBSEQUENT ISSUANCE OF PATENT. Where the title under a military warrant was eliminated by a tax deed to the land, a subsequent issuance of a patent to the holder of the warrant did not affect the title under the tax deed.

**Same.** The issuance of a patent to land located under a military warrant relates back to the date of location and removes all doubt as to the taxable character of the land after that date.

*Appeal from Clay District Court.—*Hon. A. D. Bailie, Judge.

Tuesday, September 29, 1908.

Rehearing Denied Saturday, December 19, 1908.

Action in equity to quiet title to a tract of land. Decree for plaintiffs, and defendants appeal.—*Affirmed.*

*Healy & Healy,* for appellants.

*F. H. Helsell,* for appellees.

Weaver, J.—The pleadings in this case are voluminous, if not confusing. The abstract of appellants set forth a "Petition," an "Amended and Substituted Petition," an "Amendment to the Substituted Petition," "Answer, Cross-Petition, Cross-Bill and Counterclaim," "Answer to Cross-Petition," "Reply to Cross-Petition," "Answer to Cross-Petition and Counterclaim," "Answer to Cross-Petition and Cross-Bill and Counterclaim," "Reply to the Answer and Cross-Petition of the Plaintiff," closing with a document entitled "Amendment to Answer to the Defendants' Cross-Petition and Counterclaim and as Amendment to the Cross-Petition and as a Reply to the Amendments of the Defendants Filed Since Last Term of Court."

This competitive contest between the pleaders, extending from March 6, 1903, to October 27, 1905, seems to demonstrate that the determination to have the last word is a characteristic not peculiar to the sex against which it has often been charged. The history of the title to the land in controversy may be set out as follows: A soldier's land warrant which had been issued to one Jacob Huston and assigned to one Schaffer was located upon the tract June 15, 1857, and record of the entry made in the prop-

er office. On February 6, 1885, Schaffer and wife made a quitclaim deed to the land to G. W. Patterson, who, in turn, deeded to M. E. Griffin, who deeded to Ainsworth, who deeded to Simmons; the last-named deed being made April 15, 1885. On February 11, 1889, Schaffer, for some reason, made another quitclaim to Patterson. In 1889 Simmons deeded the land back to Ainsworth, who, in 1894, conveyed the land by warranty deed to Richardson. On October 28, 1896, Richardson conveyed to Ainsworth, and on January 3, 1901, the latter conveyed to John Watson, who is or was one of the plaintiffs in this action. It should also be said that, before Ainsworth deeded to Simmons on July 10, 1885, the latter had obtained a tax deed for the land on a sale made in 1875 for the delinquent taxes of the year 1873, so that his subsequent grantees obtained whatever title said deed conveyed, as well as such title as had been obtained through the succession of conveyances from Schaffer. Watson and wife went into possession of the land, making their home thereon under his contract of purchase a considerable time before the title was conveyed to him. In April, 1900, Watson, then being in possession, received $5 from the defendants Sargent & Lahr, giving them a writing acknowledging its receipt as "part payment on the east half of the southeast quarter of section 11-94-35, Garfield township, Clay County, Iowa, balance to be paid when abstract is furnished." This receipt was signed by John Watson alone. The purchase price was not stated, nor is any time fixed in which the sale was to be consummated. On January 26, 1901, Watson, his wife joining, entered into a written contract with Sargent & Lahr for the sale of the land for $2,223, of which $5 was acknowledged to have been paid down, the further sum of $1,295 to be paid on delivery of possession March 1, 1902, and the remainder to be paid by the assumption of an existing mortgage upon the property. Watson also undertook to perfect the title

by March 1, 1902, and Sargent & Lahr agreed to a forfeiture of their rights under the contract if payments were not made strictly in accordance with the agreed terms. On June 13, 1902, Watson and wife, claiming that the foregoing contract had been abandoned, entered into a contract with the plaintiffs Herrick & Stevens to sell said land to them for $2,020, of which $100 was paid down, the further sum of $900 to be paid on delivery of possession March 1, 1903, and the remainder to be satisfied by the assumption of the existing mortgage debt. On February 26, 1903, the same parties made a supplemental contract, by which it was agreed that F. C. Gilchrist, Esq., should proceed to quiet and settle the title to the land in a manner satisfactory to the parties, and that the costs of the proceedings should be borne by them in equal shares, and, in the event that the title should not be settled satisfactorily, the vendees had the option to surrender the contract and receive a return of the advance payment. On March 3, 1903, seven days after the date of this supplemental agreement, Watson, under their promise to protect him in so doing, united with his wife in making a warranty deed of the land to Sargent & Lahr. Soon thereafter this action was instituted in the name of John Watson and wife and Herrick & Stevens as plaintiffs against Sargent & Lahr as defendants to quiet their title to the farm.

It is the claim of the plaintiffs that whatever rights the defendants may have obtained under their contracts above-mentioned were abandoned by them, and that defendants by their representations and conduct are estopped from now asserting any claim to the land adverse to the plaintiffs. In addition to such rights as they may have obtained under their contracts and deed aforesaid, defendants assert title to the land wholly independent of Watson, and this title they trace as follows: It will be remembered, as we have already stated, that the land warrant was located on the tract and entry made on June 15, 1857, by

one Schaffer, from whom the Watson title (omitting now any reference to the tax deed) is traced. So far as shown, this entry was never cancelled or set aside, but it appears that on February 24, 1858, Schaffer assigned his certificate of location to Amos Stanley, and authorized him to receive the patent. No patent was ever issued to any person until since the commencement of this action, when one was procured as will be hereinafter shown. On August 11, 1870, Stanley and wife conveyed by warranty deed to S. V. Landt, and on February 7, 1872, Landt conveyed to Hiram Balliett, a resident of Pennsylvania. Balliett died intestate, and, if he had ever conveyed the land during his lifetime, the deed does not appear of record, nor is there any one in court claiming under a title so derived. After the contracts by Watson to both Sargent & Lahr and Herrick & Stevens had been made, and the strife thus inaugurated was in progress, Sargent & Lahr appear to have discovered the heirs of Hiram Balliet, and procured a deed by which the defendants became vested with whatever interest or title said heirs had to convey. On February 8, 1904, when this action had been pending nearly a year, F. A. Lahr and Charles Sargent filed with the Commissioner of the General Land Office their affidavits that they were then the absolute and unqualified owners of the land located by Schaffer on June 15, 1857, and that they had acquired all of the interest of said Schaffer and all other persons who had or claimed any interest in said land, and asked to be permitted to make a cash substitution for the location by warrant, and that patent issue accordingly in the name of Sargent & Lahr, or in the name of Amos Stanley. On February 15, 1904, said defendants paid the sum of $100 to the receiver of the land office at Des Moines, Iowa, and received from the register of said office a certificate reciting that, in pursuance of law, Amos Stanley had purchased the land in question at the rate of $1.25 per acre, and had paid said sum in

full, and that the said Amos Stanley was entitled to receive a patent for the land described. On September 14, 1904, a patent was issued in the name of Amos Stanley. Relying both upon their claim of title thus derived through Stanley, and upon their conveyance from Watson of the title derived through Schaffer independent of Stanley, defendants resist the claim of the plaintiffs, denying the allegations made by the plaintiffs as grounds of estoppel. It will be recalled that Watson, who entered into the contract and supplemental contract for the sale of the land to defendants, and later made a contract and supplemental contract for the sale of the same land to Herrick & Stevens, and authorized a suit to be brought to quiet the title against defendants, within a week thereafter deeded the land to defendants, and three days later appeared as coplaintiff herein to quiet the title against his own conveyance to the defendants.

The next step which we need mention in this game, in which Watson appears to have been assigned the role of shuttlecock, was as follows: On the same day on which the petition herein was filed Watson, who had received some money from defendants in consideration for his deed of March 3, 1903, removed to Wisconsin, and thereafter, on August 13, 1903, defendants' counsel prepared and procured Watson and wife to execute a dismissal of the suit as to them, filing with such dismissal a statement that they never authorized the use of their names as plaintiffs, whereupon Herrick & Stevens amended the petition, making Watson and wife defendants. As a witness Watson first swore that he had no recollection of ever signing the paper dismissing the suit, but finally remembered that he had executed it at the request of defendants, but did not know its real purport, except that defendants informed him there was trouble over the land, and they needed such instrument. He repeats, however, that he neither employed nor authorized any one to file said paper in the district

court. The trial court, after hearing the evidence, found that the contract under which defendants' title through Watson originated had been abandoned by the parties thereto prior to the contract given by Watson to plaintiffs, and that the deed thereafter made by Watson to defendants was received by them with full notice and knowledge of the outstanding contract between Watson and wife and the plaintiffs, and that said conveyance was so obtained with the fraudulent intent to prevent the completion of the sale to plaintiffs. A decree was entered setting aside and cancelling the deed to defendants, who were ordered to convey the title so obtained to the plaintiffs. It was also adjudged that the patent from the United States issued in the name of Stanley was procured by the fraud and misrepresentation of the defendants, and the same was held to be of no effect against the rights of the plaintiffs. Other provisions of the decree are not material on this appeal.

I. We will first consider as briefly as possible the equities as between plaintiffs and defendants under their several contracts and dealings with the pliable Watson. It is true that defendants' contract was of prior

1. VENDOR AND
VENDEE: *bona
fide* purchaser:
abandonment:
estoppel.

date, and Herrick & Stevens had both constructive and actual notice that such agreement had been made. Being prior in time, defendants were prior in right, unless it be also shown that they had abandoned the purchase before the date of the contract with plaintiffs, or unless their conduct with reference thereto was such as to estop them from asserting any claim to the land against the plaintiffs. The deed procured by the plaintiffs from Watson after the scramble began cuts no material figure in the case; for, if the defendants are not in position to rely on their contract of January 26, 1901, a title procured from Mr. Watson after the contest began, and with knowledge of the plaintiffs' claim, would be subject to such claim in their hands precisely as it would in the hands of their grantor. Though

the evidence is by no means conclusive, we are disposed to agree with the trial court in finding that the defendants are not in position to insist upon the priority of their contract. The plaintiff Herrick testifies that defendants, or at least one of them, informed him they had thrown up the contract with Watson, and that on March 1, 1902, when said contract matured, they had told Watson they would not go on with it. He further says that, when he learned the contract had been recorded, he applied to defendants, asking them to quitclaim the land in order to clear the title, and they promised so to do. On another occasion he says that Watson in his hearing reminded the defendant Lahr of the agreement to quitclaim, and asked him why he did not do so, and Lahr replied "because there is more money in it for us not to." These statements are denied by defendants, but plaintiffs' version is strongly corroborated by Mr. Gilchrist, who says that he applied to Mr. Lahr for a quitclaim to the plaintiffs, and Lahr admitted they had promised to quitclaim, but said they had now obtained additional rights in the land. He further stated, according to this witness, that they—defendants—claimed nothing under the Watson title, and that said title did not amount to anything. Quite significant, also, of the attitude of the defendants with reference to this land in 1902, is the testimony of one Bronlee, who, holding a claim for collection against Watson, applied to Sargent & Lahr, who were collection agents for the house represented by the witness, for information as to the possibility of obtaining payment. Lahr informed the witness that Watson had sold his farm to Herrick & Stevens, and advised the witness to see Watson, and get an order from him on Herrick & Stevens. In pursuance of this suggestion, Lahr took the witness out to Watson's place, and advised the latter to settle the claim in the manner suggested. On the following day Watson made the order which was presented to, and accepted by, Herrick & Stevens. The order was made

payable on March 1st, when the contract for sale to Herrick & Stevens would mature, and was left by the witness in the possession of Sargent & Lahr for collection. This conduct on defendants' part is not only consistent with the theory that they had abandoned all claim to the land under their contract with Watson, but is quite inconsistent with the idea that they were then asserting any right or claim thereunder. Without extending this opinion to recite all of the testimony and circumstances bearing upon this feature of the case, we have to say we are reasonably satisfied that defendants, either because they thought there was no profit in the land under their contract, or because they believed they could get an independent title at less cost, did abandon the thought of taking title from Watson until some time after the latter had entered into the contract to convey to the plaintiffs.

II. We have next to consider whether the line of conveyances from Stanley to Landt and the Balliet heirs to the defendants constitutes an independent title paramount to the title which plaintiffs obtained or contracted for from Watson. If this depended solely on the comparative validity and effect of the deed by Schaffer, the entryman, to Patterson, and the deed by Stanley, assignee of the certificate of location, to Landt, it might be a question of some doubt whether the latter would not be preferred in equity. But, as we have seen, a tax title to the property was obtained by Simmons before he received conveyance of the Schaffer title, and this title through intermediate conveyances became vested in Watson before the making of the contract by him to the plaintiffs. If, therefore, this tax deed was valid, it became the foundation of a new and independent title from the State, and a determination of the relative rights of Stanley and Schaffer and their several grantees is unnecessary.

The appellants deny the validity of the tax title, because, as they say, neither the legal nor equitable title to

the land had passed from the United States at the time

2. PUBLIC LANDS: location by military warrant: taxation.

the taxes for which the sale was made were assessed and levied, and because under the statutes of the United States land located under a soldier's warrant is exempt from taxation for a period of three years after the issue of patent therefor. We are of the opinion it is not correct to say that the equitable title to this land had not passed from the United States at the time these taxes accrued. The warrant held by Schaffer was located in the year 1857, and from that date either Schaffer, the entryman, or Stanley, the assignee of the certificate of location, was entitled to receive a patent from the United States. While the legal title remained in the United States, it was so held for the benefit of the person who at the date of the location was the holder of the warrant or for the assignee or grantee of such person. From the date of the location the land ceased to be a part of the general domain of the government open to purchase or settlement by any one, and the legal title was thereafter held by the government as in the nature of a trust for the use of the person showing himself entitled to the benefit of said location. The fact which is made to appear, that the formal approval of the location and issuance of the patent were suspended because of apparently conflicting assignments of the warrant, does not affect this conclusion. The officers of the government were not denying the right of the holder to locate the warrant on this land; but, in view of the fact that the original holder appeared to have made two assignments of it, further action was suspended until the apparent conflict of rights thus created could be removed. The rights of the locator in the premises do not date from the time when he succeeded in removing the cloud, but from the date when the location was actually made. It is the well-established doctrine that he who has the right to property, and is not excluded from its enjoyment, shall not be permitted

to use the legal title of the government to avoid his just share of taxes. *Railroad Co. v. Price,* 133 U. S. 496 (10 Sup. Ct. 341, 33 L. Ed. 687). And the fact that patent is suspended during some investigation or controversy concerning the rights of the person claiming such patent does not necessarily prevent the application of this rule. *Railroad, Co. v. Patterson,* 154 U. S. 130 (14 Sup. Ct. 977, 38 L. Ed. 934); *Maish v. Arizona,* 164 U. S. 609 (17 Sup. Ct. 193, 41 L. Ed. 567); *Loan & Trust Co. v. Railroad Co.* (C. C.) 76 Fed. 15.

The case of *Witherspoon v. Duncan,* 71 U. S. 210 (18 L. Ed. 339), is in principle quite parallel with the one before us. There the government had provided for the donation of certain lands to settlers who had been required to vacate other lands ceded to an Indian tribe. A party entitled to locate a claim under this provision did so, and received the receipts of the register and receiver of the land office, but for some reason the issuance of patent was suspended or delayed. Meanwhile another person entered the land, and obtained a certificate therefor. Before the patent finally issued upon the first entry, a tax title had been obtained by a third person. This title was held good. The court there overruled the same argument now advanced in behalf of the appellants, and says: "In no just sense can lands be said to be public lands after they have been entered at the land office and certificate of entry obtained. If public lands before the entry, after it, they are private property. If subject to sale, the government has no power to revoke the entry and withhold the patent. A second sale, if the first were authorized by law, confers no right on the buyer, and is a void act. . . . The contract of purchase is complete when the certificate of entry is executed and delivered, and thereafter the land ceases to be a part of the public domain. The government agrees to make a proper conveyance as soon as it can, and, in the meantime, it holds a naked legal fee in

trust for the purchaser who has the equitable title." See, also, *Carroll v. Safford,* 44 U. S. 441 (11 L. Ed. 671).

The patent title to the land in question, whether it is traced through the Schaffer conveyance, as appellees contend, or through the Stanley conveyance, as appellants 3. SAME: sale contend, rests on the Schaffer entry in 1857,

for taxes. and from that date the land became subject to assessment and taxation, and the tax deed to Simmons, therefore, passed a good title, unless this result is avoided by the effect of the exemption by which, under the laws of the United States, lands given as bounty for military serv- ice shall, while they continue to be held by the patentee, be exempt from taxation by any State or municipal author- ity for the term of three years from and after the date of the patent issued therefor. As the patent in this case did not issue until the year 1904, it is argued that a tax title resting upon an assessment and levy made long before that date must be held void. It is to be observed, however, that, while this land was located under a soldiers' warrant, it was not located by the soldier himself. He sold his right to make the entry to Schaffer, but the exemption from taxation was in the nature of a personal privilege which did not pass with the right of entry to his assignee. This we have repeatedly ruled in other decisions involv- ing like question. See *Long v. Olson,* 115 Iowa, 388, and cases there cited. No other objection to the validity of the tax deed is raised by the defendants, and we see no escape from the conclusion that it passed a good title to the grantee therein named.

IV. It follows from the conclusions announced in the foregoing paragraphs of this opinion that the findings of the district court must be affirmed, unless the patent which 4. SAME: defendants procured to be issued pending

subsequent this litigation operates in some way to
issuance
of patent. strengthen their position and give them a claim upon the title. But we see no logical or equitable

ground upon which to base such a holding. The patent was issued not to Sargent & Lahr, or either of them, but to Amos Stanley, and they can obtain no right nor title by virtue of such patent, except as they are able to trace it through said patentee. That title has been eliminated by tax sale and deed. So far, then, as the record discloses Watson's title was good against the world, and as we have already held that appellees' contract for the purchase of the land from Watson must prevail over the contract and deed made to the appellants, it follows that the decree of the trial court can not be disturbed.

Counsel severely criticise that provision of the decree which finds that the patent was procured by fraud, and declares that instrument void. We are of the opinion that whatever may have been the intent of appel-

5. SAME.

lants in making the representations complained of in procuring the issuance of the patent their conduct in that respect did not operate as a fraud upon the appellees. It was to their interest to have the patent issued either to Schaffer or Stanley. In either event, the passing of the legal title from the government related back to the date of the entry in 1857, and served to remove all doubt as to the taxable character of the property after that date, thus affirming the sufficiency and efficacy of the tax deed. There was no occasion, we think, for declaring the patent void, but, as the appellants are not prejudiced thereby, and the appellees did not appeal, we are not inclined to modify the decree in that respect. If, as counsel seem to think, the decree in this respect is a mere *brutum fulmen* without effect upon the existence or validity of the patent, then no one is harmed.

The decree of the district court is *affirmed*.